Jerome **BINKLEY**, Appellant
(Defendant Below),

v.

**STATE** of Indiana, Appellee
(Plaintiff Below).

No. 82S00–9308–CR–940.

Supreme Court of Indiana.

Aug. 10, 1995.

Eugene C. Hollander, Indianapolis, for appellant.

Pamela Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

After two mistrials, appellant Jerome Binkley was tried a third time before a Vanderburgh County jury. Though the evidence was circumstantial, he was convicted of murdering his friend Wayne Kemp. The court sentenced Binkley to the maximum sixty years for murder, and added thirty years because Kemp was found an habitual offender. Binkley now challenges his conviction on two grounds. First, he asserts that the evidence was insufficient to support the jury's verdict. Second, he challenges his sentence as manifestly unreasonable. We affirm.

### I. Sufficiency of the Evidence

Binkley argues that the evidence in the record "does not establish that the Defen-

dant is the person who shot the decedent, or that the Defendant acted in a knowing manner." Brief for Appellant at 22. Thus, he says, the State proved only that Kemp died from a gunshot wound to the head, not enough to sustain the conviction.

When reviewing whether the evidence was sufficient to support the conviction, we do not substitute our judgment for that of the jury. The verdict comes before us with a presumption of legitimacy. We reverse only if, after viewing the evidence in the light most favorable to the judgment, we are convinced that as a matter of law the facts of the case and reasonable inferences drawn therefrom do not support the verdict. *Gilmore v. State* (1981), 275 Ind. 134, 415 N.E.2d 70. This is a high hurdle. Still, when there are no witnesses to the murder and the prosecution depends on circumstantial evidence, it is incumbent on an appellate court to ensure that the record contains adequate support for the conviction.

The evidence at trial showed that in the early morning hours of August 31, 1991, Wayne Kemp was shot in the head while sitting in the front seat of his car. After completing an autopsy, the coroner could not determine what type of gun fired the fatal bullet. Furthermore, the police could not find the fatal bullet. They did discover, however, a spent shell casing on the floor of the car. Ballistics tests confirmed that the casing had housed a bullet fired from a Taurus nine-millimeter pistol found in a trash can behind the house of the appellant's friend, Dennis Owens.

Linking the putative murder weapon to Binkley was an important element of the State's case. Though the pistol had been cleaned of fingerprints, Owens and another witness, Bill Loveland, testified that it had been in Binkley's possession the night of Kemp's murder. Police confirmed that the pistol was one of several firearms stolen a week before the murder from a Terre Haute sporting goods store. Binkley, Loveland, and Kemp were suspects in that robbery. Quite a number of the Terre Haute weapons were also recovered from Owens' trash can. According to Owens, Binkley had left a trash

bag containing several guns, including the Taurus pistol, at his (Owens') house a few days before the murder. Owens took a fancy to the pistol, and at some point gave Binkley forty dollars toward its purchase.

The night before the murder, Owens and Binkley met with friends at various Terre Haute night spots. Owens had loaded the pistol before leaving home, and had it with him in his car. He still considered it to be Binkley's gun, and gave it to Binkley after he asked for it in the parking lot across the street from Nolan's Bar. At some point, Wayne Kemp's car pulled up to the group of revelers in the parking lot. Owens last saw appellant that night walking toward Wayne Kemp's car.

The next morning Binkley came to Owens' house and presented him with a cloth bundle containing the pistol, now covered with sand and dirt. Binkley left, but returned later in the day after being questioned by the police. He informed Owens that the police were looking for the guns stolen in Terre Haute in connection with Kemp's murder, and he said they needed to get rid of them. Owens, who had cleaned the Taurus pistol prior to Binkley's return, concealed it with the other weapons at the bottom of a trash can in the alley behind his house. A short while later Binkley was arrested at Owens' house for Kemp's murder. Owens subsequently led detectives to the stash of guns.

Loveland corroborated Owens' account in important ways. He testified he had been sleeping at Binkley's apartment on the night in question, and he was awakened at least twice before sunrise. On the first occasion, while Binkley was still out on the town, Wayne Kemp came by looking for him. Kemp left after smoking some cocaine, possibly heeding Loveland's suggestion to look for Binkley at Nolan's. (It was outside Nolan's where Owens observed appellant approach Kemp's car.)

Loveland was awakened again about 4 a.m. when Binkley returned to the apartment. The two took to the streets on Loveland's

bicycle just as dawn was beginning to break. They first attempted to call on Owens. When no one responded to their knocking, Binkley produced a nine-millimeter pistol and hid it in the barbecue grill behind Owens' house (thus explaining the gritty coating Owens described). They next attempted to purchase cocaine at another location, without success, and finally proceeded at Binkley's direction to the alley where Kemp's car sat with his body inside.

At the car, Binkley retrieved the keys from inside and opened the trunk. Binkley told Loveland he had already taken five hundred dollars from Kemp and was searching for "the rest of the money."[1] The trunk search proved unsuccessful, and Loveland and Binkley departed for a nearby crack house. On each of two visits Binkley acquired a gram of cocaine. The cocaine had a street value of a hundred dollars per gram. When arrested several hours later, Binkley was carrying three one-hundred dollar bills and a one-dollar bill.

The testimony by Owens and Loveland strongly suggested Binkley's guilt, of course, but there was also physical evidence linking appellant to the murder. The clothes he was seen wearing the night of the murder turned up covered in blood in a dumpster. Tests of the blood on Binkley's sweatshirt and blue jeans indicated that the blood could have come from the decedent, but not from Binkley. There was also evidence that Binkley knew Kemp was about to receive his loan check. According to Loveland, Kemp had approached Binkley about purchasing some of cocaine once the loan check cleared. Binkley told Loveland he intended to "gank" (that is, rob) Kemp instead.

Binkley's lawyer struggled mightily to undermine Loveland's testimony by introducing several sworn statements in which Loveland told different versions of the events on the night of Kemp's murder. His brief on appeal casts Loveland's testimony as "inherently unbelievable, and unreliable." Whatever incentives Loveland may have had to perjure him-

---

**1.** It seems that the day before his murder, Kemp had cashed his Indiana State University loan check. His widow testified that even after paying various debts and other expenses, he still had five or six one-hundred dollar bills on his person in the hours before his death. This cash was not recovered from the murder scene.

self, we think a jury could have reasonably concluded, based on the testimony of Loveland and Owens and the attendant physical evidence, that Binkley had indeed followed through with his stated intent to "gank" Kemp, with fatal consequences.

Appellate counsel also attaches great significance to the fact that after the first two mistrials, the prosecutor asked Dr. Kohr, the medical examiner, to reexamine his estimate of the time of death. In the first two trials, Kohr fixed the time of Kemp's murder between 4:30 and 6:30 a.m. In the third trial, Kohr claimed the death could have occurred as early as 2:30. This revised estimate fit better with the prosecution's theory, based on Loveland's testimony, that Binkley murdered Kemp before his 4 a.m. rendezvous with Loveland. Such a potentially material change in testimony raised questions about the credibility of the medical examiner's estimate, but his reevaluation of his own autopsy results was plausible. This jury was fully apprised of Dr. Kohr's testimony in Binkley's earlier trials, and the circumstances of his change of assessment (he read a new textbook) were fully explored on cross-examination. We decline to reweigh this evidence.

■ Finally, we turn to Binkley's contention that the State failed to prove that he possessed the requisite state of mind to support a murder conviction. Binkley was charged with knowingly killing Wayne Kemp. Ind.Code Ann. § 35–42–1–1(1) (West 1986 & Supp.1991). A jury may reasonably infer that a person who fires a loaded weapon at the head of another person, thereby inflicting a mortal wound, commits a killing. There was no error here.

## II. Reasonableness of the Sentence

Binkley also claims that his ninety-year sentence was manifestly unreasonable, invoking Ind.Appellate Rule 17. Counsel makes just passing reference to clauses in the Indiana Constitution prohibiting cruel and unusual punishment and grounding our penal code in principles of reformation rather than vindictive justice. Ind. Const. art. I, §§ 16, 18. He provides no argument on these points. We therefore analyze this claim under the rule alone, but find Binkley's arguments unpersuasive.

■ After reviewing the pre-sentence report and conducting a sentencing hearing, the trial court imposed the maximum sentence for murder, explaining:

Court being fully advised now finds for the offense of Murder, the presumptive sentence is enhanced to the maximum of sixty (60) years. Court finds there is a high risk the Defendant will commit another crime as illustrated by his prior criminal history. Court also notes from his record that the Defendant has been no stranger to violence throughout his life, having been in trouble in his public school career for fighting, using a knife during a robbery, displaying a gun during a confrontation with police in the State of California, and the Court takes all those things into consideration in enhancing the sentence.

Another factor considered is the cold blooded killing of the victim and the Court finds the Defendant is in need of correction, and therefore the presumptive sentence is enhanced to sixty (60) years.

Record at 209. These are permissible considerations for enhancing a sentence.

■ Binkley also challenges his additional thirty years for being an habitual offender. The statute required a thirty-year enhancement of the sentence for the principal felony, but allowed the trial judge discretion to add as little as twenty years if one of the priors on which the habitual offender determination was based was a class D felony. Ind.Code Ann. § 35–50–2–8 (West Supp.1991). Binkley seems to suggest that once his sentence for murder had been enhanced based in part on Binkley's prior criminal history, it was manifestly unreasonable for the judge to impose the full thirty years for the habitual. We disagree.

The record shows that Binkley had a criminal history that went beyond the felonies on which the habitual offender finding was based. The pre-sentence report contains several examples of Binkley's run-ins with the law in this state and in California, in addition to his felony convictions. It was not unreasonable for the trial court to impose the

maximum for murder and decline to add less than the standard thirty years for the habitual offender determination.

We affirm the conviction and the sentence.

DeBRULER, DICKSON, and SULLIVAN, JJ., concur.

SELBY, J., concurs in result.