

**FILED**

Mar 22 2019, 7:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan P. Dillon
Dillon Legal Group, P.C.
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan M. Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jaqueline B. Walters,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 22, 2019

Court of Appeals Case No.
18A-CR-1021

Appeal from the Morgan Superior
Court

The Honorable Brian Williams,
Judge

Trial Court Cause No.
55D02-1511-F3-1653

**May, Judge.**

[1] Jaqueline B. Walters appeals her conviction for Level 3 felony aiding, inducing, or causing armed robbery.[1] She presents two issues for our review that we restate as:

1. Whether the trial court abused its discretion in admitting phone records from Verizon; and

2. Whether the State presented sufficient evidence Walters aided, induced, or caused an armed robbery.

We reverse.

# Facts and Procedural History[2]

[2] Walters started working at the deli in the Morgantown IGA in June 2015. On August 30, 2015, Walters and store manager Wilma Floyd were scheduled to open the store. This required both to be at the store an hour before the store opened to customers. Floyd had the keys to get into the building and to access the safe.

[3] Walters' long-term boyfriend, Randall Shane Slaten, dropped her off at the store. As Walters approached the door, Floyd unlocked and opened the door for her, disarming the alarm in the process. However, as Walters proceeded

---

[1] Ind. Code §§ 35-42-5-1 (2015) (elements for robbery) & 35-41-2-4 (1977) (elements for "Aiding, inducing or causing an offense").

[2] We note the font used in Appellant's brief does not conform with the approved fonts or sizes listed in Indiana Appellate Rule 43(D).

through the door, a male with a gun (hereinafter, "the Robber") pushed Walters and entered the store. Floyd attempted to push the Robber back through the door but was unsuccessful. Floyd and the Robber scuffled. Eventually, the Robber's gun went off. No one was shot, but Floyd then stopped resisting.

[4] The Robber instructed Floyd and Walters to take him to the safe. The store surveillance system was able to record much of the interaction. Floyd led the Robber to the room in which the safe was. However, during the scuffle, she had dropped her keys and could not enter the room. The Robber instructed Walters to retrieve the keys. Walters complied.

[5] Floyd opened the room to the safe and, subsequently, the safe and cabinets in that room. The Robber stole approximately $6,000.00. Before he left, the Robber had Walters put zip ties around Floyd's wrists. The Robber tightened Floyd's zip ties and then put zip ties around Walters' wrists, too. The Robber patted Floyd down for a cell phone and ripped the land line phone from the wall. The Robber then left.

[6] Floyd had Walters cut her zip ties from her wrists and then Floyd freed Walters. Floyd had secreted a small flip phone in her pocket that the Robber did not find. Floyd called 911 and officers quickly arrived. She also called the owner of the store, Randy Wood.

[7] Morgantown Police Officer Jeffrey Jackson arrived at the scene first. He found a hat worn by the Robber and a magazine for a gun. Morgan County Sheriff's

Department Detective Mark Anderson arrived and interviewed the women separately.

[8] On September 1, 2015, Detective Anderson requested Walters give a more detailed interview. When she did not arrive at the station on time, both Morgantown Police Marshal Marvin McGregor and Detective Anderson called to verify she was still planning to attend. Walters explained she was running late but would be there soon.

[9] After Walters gave the detailed interview, Detective Anderson believed Walters' account of the events was inconsistent with what she had previously reported and with the video surveillance. He noted the video showed Walters was frequently not under direct control of the Robber. In the second interview, Walters said she "saw the robber cock the gun as they were going down the hallway[,]" (Tr. Vol. 3 at 122), but she had not indicated she had seen that in the first interview.

[10] When the interview was complete, Detective Anderson asked Walters for her phone and whether he could look through it. Walters told Detective Anderson that Slaten had lost it. Slaten indicated Walters still had it. The phone was never produced. Detective Anderson "sent a preservation letter[,]" (Tr. Vol. 3 at 129), to put a hold on the Verizon phone records for the number Walters said she shared with her boyfriend (hereinafter, "6065 Phone"). Detective Anderson explained this action preserves "all of the phone records that they have up to that point, text messages, and everything[.]" (*Id.*)

[11]     Detective Anderson sought and received a search warrant for the Verizon records for the phone. Because he had requested Verizon preserve the account, Detective Anderson also received the text message records for the time frame surrounding the robbery date.[3] Therein, one number was repeatedly texted. The text of the messages between 6065 Phone and that number discussed a plan to rob the IGA. Officer Jackson determined the phone number belonged to John Nocito. Nocito was the long-term boyfriend of Slaten's sister. Detective Anderson obtained a DNA swab from Nocito, and his DNA matched the DNA found on the cap dropped by the Robber at the store.

[12]     The State charged Walters with aiding, inducing, or causing an armed robbery. A jury trial held in July 2016 resulted in a hung jury. A second jury trial was scheduled for March 6-8, 2018. Prior to the second jury trial, the State filed a motion for an evidentiary hearing as they planned on advancing a theory of conspiracy between Walters, Slaten, and Nocito. The State wished the text messages to be deemed statements of coconspirators so the statements would not be hearsay.

[13]     On July 13, 2017, at the evidentiary hearing, the State requested the trial court take judicial notice of the evidence presented during Slaten and Nocito's trials *i.e.*, the cell phone records from Verizon. Walters objected because she had not been present during those trials to "make any objections of her own[.]" (Tr.

_____

[3] Detective Anderson explained that not all text messages are recoverable from Verizon phone records because texts sent or received by a computer are not always preserved in Verizon's records.

Vol. 2 at 4.) She conceded the trial court could "take judicial notice that that trial occurred and certain evidence was presented" but not as to whether it was admissible against her. (*Id*.) The trial court agreed regarding the admissibility but said, "I think we're talking about whether or not and how evidence is presented here to me today regarding the existence or nonexistence of conspiracy." (*Id*. at 5.) The trial court took judicial notice of the Verizon cell phone records containing the text messages.

[14] When Detective Anderson started to testify regarding the contents of the text messages, Walters objected as no foundation had been laid regarding the inception of the text message records. The trial court, reading from the evidence rules, indicated the "rules are inapplicable to other than respect to privileges[,]" (*id*. at 7), and do not apply to "preliminary, questions of fact, the determination of questions of fact preliminary to the admissibility of evidence and the issues to be determined by the Court under rule 104 A [sic]." (*Id*.) Walters withdrew her objection.

[15] In support of its conspiracy theory, the State presented evidence the text messages referenced stealing a sum of money that was "consistent with the amount of money taken[.]" (*Id*. at 8.) The text messages indicate Nocito would be "working with my girl named Jackie." (*Id*.) The messages indicate the days Walters worked and that the robbery needed to occur on a day she was working. The messages indicate the writer of the messages would need to get more information from Walters about the best day to rob the store. Additionally, the State presented evidence Walters' statements to the police had

been inconsistent with what was shown on the video and Walters had been complicit in hiding the 6065 Phone from the police. Finally, the State argued Walters' insistence that Slaten was not the getaway driver, when she was not present to see the Robber leave the store, were indicative of her knowledge Nocito had his own driver—a fact that was referenced in the text messages.

[16] Walters argued the text messages actually tell Nocito he was doing the job "*on Jackie[,]*" (*id*. at 14) (emphasis added) (*see also* Exhibit Index at 70 (Exhibit 45 containing text message records)),[4] rather than with her and that the State could not prove who wrote the messages on the 6065 Phone. Additionally, Walters argued the State did not present independent evidence of a conspiracy other than the text messages.

[17] The trial court found "the State ha[d] met its threshold to show the existence of a conspiracy[,]" (Tr. Vol. 2 at 23), and the phone records were admissible as non-hearsay under that theory.[5] At the beginning of the jury trial, regarding the admission of the text message records, the trial court stated it "d[id]n't intend to relitigate that[.]" (*Id*. at 30.) Walters objected to the lack of foundation and trustworthiness of those records. The trial court said:

---

[4] The exhibit volume is not independently paginated. As the exhibits at issue are lengthy, we reference the page numbers as indicated in the digital PDF.

[5] Although the trial court requested the State prepare an order memorializing this ruling, no such order is in the record before us. We cannot confirm whether such an order was put in writing because Walters did not provide us with a chronological case summary as required by Indiana Appellate Rule 50(A)(2)(a); therefore, we proceed based on the statements made in the transcript.

It would be my intention as to the foundational testimony for that evidence to incorporate by reference the foundational hearing that was conducted outside the presence of the jury at the last hearing, unless there's a new and different arguments [sic] to be addressed, I don't see any benefit in having the jury waiting in the wings while we relitigate that to the same evidence to the same arguments and to the same conclusion. So I think incorporation of that would be appropriate.

(*Id*. at 31.)

[18] When the State presented the first set of text messages as Exhibit 45,[6] it also presented an affidavit of certification from Verizon. The records were procured "about a month after [Detective Anderson] submitted the search warrant . . . 2015[,]" (Tr. Vol. 3 at 136), but the certification was dated February 27, 2017.

---

[6] The State introduced the disc of what was in Exhibit 45 as Exhibit 62. Walters objected to the admission of Exhibit 62 "as to the lack of certification again[.]" (Tr. Vol. 3 at 149.) As the same certification served for both exhibits, we address them both as the same issue.

Certification of Records

To:  Officer Mark Anderson, State of Indiana
Ref:  Verizon Case number 150201682

I, Virginia Fippinger hereby state and declare that I am the "Custodian of Records" for Verizon Wireless. I have been employed in the Verizon Security Assistance Team since June 2015.  My duties include but are not limited to complying with subpoenas, court orders, search warrants and any other legal documents requesting records owned and maintained by Verizon Wireless. I have knowledge of and assist in maintaining all customer records for Verizon Wireless on a daily basis.

I certify that the records accompanying this certification:

1. Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

2. Were kept in the course of regularly conducted activity: and

3. Were made by the regularly conducted activity as a regular practice.

4. Were true copies of all the records described in the request from Officer Mark Anderson dated September 8, 2015 generated by the Verizon Wireless billing system.  Specifically: Call detail records, Text detail records, precision locate information with Cell sites and Text content.

I declare under penalty of perjury that the foregoing information is true and correct.

Executed this 27th Day of February 2017.

Signed: _____

Cause No. 1452
55D02451-F3-
Exhibit 45
of State

Cause No.
55D02451-F3-1653
Exhibit 45
of State

(Exhibit Index at 67.)

[19] Walters objected to the introduction of the phone records "on hearsay grounds." (Tr. Vol. 3 at 137).  She argued they were not self-authenticating and did not "comply with Indiana Rule 803(d)." (*Id.*)  She asserted the certification was not specific and "could apply to anything [as it did not] state what phone

number it applies to . . . what search warrant it is responding to. It's just what dates the records that it is attached cover."[7] (*Id.*)

[20] The State asked additional questions and Detective Anderson explained Verizon "create[d] a cause number of their own, or a case number of their own, and everything that comes in for that phone number from that search warrant or any other, it goes into that case number and is delivered out through that case number." (*Id.* at 138.) If Verizon "find[s] additional stuff[,]" (*id.* at 139), "[i]t goes into that case file[.]" (*Id.*) He then explained Verizon's encryption technique and the procedure to retrieve the documentation online. As to the gap between the records and the certification, Detective Anderson explained they were supposed to be together but Verizon had failed to send it originally, so he had to contact them again in 2017 and they "fixed it[.]" (*Id.* at 140.) Walters objected to Detective Anderson's testimony as it was not clear "that this witness can know what Verizon is doing to these records and anything about that." (*Id.*) The State responded Detective Anderson had talked to Verizon and then asked a follow up question as to how Detective Anderson had that information. Detective Anderson said:

> Yeah, we're in contact with . . they have a team that's all they do is search warrants and subpoenas, and I call them frequently and ask them questions, and I asked them about this, and he said that what they do is they just . . they can't modify the records, all they

---

[7] We note Walters was incorrect in her statement the certification listed the dates to which the records applied. The certification merely listed the date of Detective Anderson's request. (*See* Exhibit Index at 67.)

can do is take those records, put them in that file and send them to us, and they certified that that's what they did. So the certification is just where they had sent those files from back in 2015 to me and that nothing has changed from it.

(*Id.* at 141.)

[21] Walters still objected to the exhibit

based on the previous argument, as well as Detective Anderson just stated that Verizon keeps this open and keeps adding records to it as it goes along, so there is absolutely no indication as to the dates and whether or not this complies with the original search warrant, or if it has gone outside the scope of previously traditionally authorized search warrants. So I do not think that this authorization provides trustworthiness as to the records being proposed entered into evidence.

(*Id.*) However, the trial court found:

Well, this is one of those things where the paper age and the digital age have not yet quite caught up with one another. Given my understanding of things, this is their method of delivery of certified documents, there's a certification from a business records custodian. Objection is overruled, records are allowed in evidence.

(*Id.* at 142.)

[22] Detective Anderson also obtained the phone records for Nocito's phone. Therein, Verizon provided the certification *with* the records. That certification was different from the certification of the 6065 Phone records as it included the phone number the records purported to represent.

**CERTIFICATION OF RECORDS**

Date: 11/16/15

Case Number: 150251263

TO WHOM IT MAY CONCERN:

I do hereby certify and solemnly affirm under the penalties of perjury that, to the best of my knowledge, information and belief, the enclosed records are an accurate reproduction of the business records pertaining to:

▬9777

These records are created and kept in the course of the regularly conducted business activity of  Verizon Wireless , as a regular practice of that business
(Business Name)
activity. They were made at or near the time of the occurrence of the matters set forth therein, by or from information transmitted by a person with knowledge of those matters.

To the best of my knowledge and belief, the records are complete, as maintained by  Verizon Wireless . The originals of said records are maintained
(Business Name)
through our records department and I certify that I am the Custodian of such records.

Sincerely,

Signing for Custodian of Records

DANIEL S GIAMMARINO
Notary Public, State of New Jersey
My Commission Expires
March 07, 2017

(Exhibit Index at 102, Exhibit 70) (full phone number redacted here but provided in the exhibit).[8]

---

[8] Exhibit 70 is merely a disc without the corresponding printout of the certificate. Therefore, we reference the PDF pagination listing the disc.

[23] The jury found Walters guilty. The trial court sentenced her to eight years.

# Discussion and Decision

## Admission of Evidence

[24] The trial court has broad discretion when deciding whether to admit evidence. *Gaby v. State*, 949 N.E.2d 870, 877 (Ind. Ct. App. 2011). We will not reverse the trial court's decision absent a showing of a manifest abuse of that discretion resulting in the denial of a fair trial. *Id*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*. "[F]oundational requirements to admissibility often require factual determinations by the trial court[.]" *Ground v. State*, 702 N.E.2d 728, 730 (Ind. Ct. App. 1998). These findings are entitled to the same deference, *i.e.* an abuse of discretion standard. *Id*. When the review involves the interpretation of a rule of evidence, that is a question of law for this court. *Id*.

[25] Walters argues the certification used to authenticate the 6065 Phone records was not self-authenticating, reliable, or trustworthy because it was executed approximately eighteen months after production of the records, it was not notarized, the affidavit did not include the number of pages certified, and it did not "include any identification information by which anyone outside of possibly the proponent, Verizon, could tie the records to the phone number listed on the search warrant." (Br. of Appellant at 10.) The State counters that the certificate is a proper authentication for the phone records to be considered

business records and, thus, be admissible under that exception to the rule against hearsay. *See* Ind. Evidence Rule 803(6) (business record exception).[9] However, the State argues, the records are not hearsay because they were statements made by coconspirators. *See* Ind. Evidence Rule 801(d)(2)(E) (co-conspirator statements).

[26] Hearsay is any statement made out of court and offered to prove the truth of the matter asserted in court. Evid. R. 801(c). Some statements that otherwise would be hearsay are defined as non-hearsay, such as statements made by coconspirators, when offered into evidence by an opposing party. Evid. R. 801(d)(2)(E). To be admissible under this rule, the State must establish a conspiracy exists without using the statements at issue. *M.T.V. v. State*, 66 N.E.3d 960, 964 (Ind. Ct. App. 2016), *trans. denied.* However, before reaching the subject of whether the statements were made pursuant to a conspiracy, because the "statements" consist of business records, those records must be authenticated.[10]

---

[9] Indiana Evidence Rule 803 was amended by 2019 Indiana Court Order 0004. This amendment consisted of the removal of a clause from Indiana Evidence Rule 803(3) and does not affect our analysis herein. C.O. 0004.

[10] The trial court's refusal to address the authenticity of the records during the evidentiary hearing prior to trial has led to confusion. The trial court found, based on Indiana Evidence Rule 104(a), that preliminary questions did not require the court to be bound by the evidence rules. (*See* Tr. Vol. 2 at 7.) Walters then stopped arguing about foundation. Thus, the records were not authenticated at the pre-trial evidentiary hearing; rather, the foundational argument was delayed until the trial, contrary to the trial court's statements at the beginning of the trial that it was incorporating the evidence from the "foundational hearing that was conducted . . . at the last hearing[.]" (Tr. Vol. 2 at 31.)

[27] "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). Without being required to provide absolute proof of authenticity, the proponent must present "[e]vidence that establishes a reasonable probability that the document is what it is claimed to be[.]" *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. Records found to be business records under Indiana Evidence Rule 803(6), such as these, may be self-authenticating and an exception to the rule against hearsay, if they are accompanied by "a certification under oath of the custodian[.]" Ind. Evidence Rule 902(11). However, for the self-authentication to be valid, the records must be shown to be trustworthy. *Id*; *see also* Evid. R. 803(6)(E) (business records are not excluded by the rule against hearsay when "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness").

[28] Here, the certificate offered to authenticate the phone records for the 6065 Phone was issued approximately eighteen months after the records were obtained, does not contain the phone number for which the search warrant requested records, does not contain the number of pages it purports to authenticate, and does not contain the dates the records encompass. The State only had the testimony of Detective Anderson, not a Verizon employee, to explain how Verizon explained to *him* their handling of search warrants and subpoenas and why the certificate was not sent with the records originally.

[29] Over Walters' objection based on hearsay, Detective Anderson testified Verizon "create[d] a case number of their own, and everything that comes in for that phone number from that search warrant or any other, it goes into that case number and is delivered out through that case number." (Tr. Vol. 3 at 138.) Detective Anderson explained he accessed the information via a password protected file he received from Verizon. When asked "what happens if they update it," (*id*. at 139), Detective Anderson responded: "It goes into that case file . . . and everything is there that they've put in [and his] password is still good for that[.]" (*Id*.) When Detective Anderson testified about the phone records retrieved from Nocito's phone, Walters noted the certification affidavit listed the phone number for which it purported to authenticate but the affidavit for 6065 Phone did not contain that information.

[30] Walters argues this affidavit is similar to the affidavit presented in *Speybroeck v. State*, 875 N.E.2d 813 (Ind. Ct. App. 2007), *reh'g denied*. In *Speybroeck*, the affidavit presented to the trial court did not specify "the number of pages nor identif[y] the documents it purports to authenticate." *Id*. at 820. The text of the affidavit appeared to be "merely a boilerplate recitation unconnected to the underlying documents." *Id*. Additionally, the affidavit was signed and dated one day before the records were created. *Id*. Because of these problems, we held the affidavit was "insufficient to authenticate the . . . documents under Rule 902(9)." *Id*. The State argues Walters' reliance on *Speybroeck* is misplaced because the affidavit in *Speybroeck* was pre-dated and "little more than a form letter." (Br. of Appellee at 19.)

[31] Even if an affidavit purports to authenticate a business document, that evidence still may be excluded if "the circumstances of the record's preparation indicate a lack of trustworthiness." *Speybroeck,* 875 N.E.2d at 819. Although a valid certificate of authenticity may not need everything Walters complains this certificate is lacking, it does require some level of trustworthiness. By its tardiness and lack of conformity with the other Verizon certification used in this trial, this certificate lacks indicia of reliability. This certificate contains no other identifying characteristics, aside from Verizon's internal case number. *See supra* ¶18. Without a timeframe reference and identification of the records in some way separate from the Verizon case number, it is unclear what documents this certificate purports to certify.

[32] We cannot say the State provided proper authentication of these records to breach the threshold question of admissibility. *See Speybroeck*, 876 N.E.2d at 820 (an affidavit containing neither number of pages nor document identification lacks trustworthiness). Without authentication, we do not reach the question of whether the statements made therein were admissible as coconspirator statements. The trial court abused its discretion when it admitted the evidence of the phone records for 6065 Phone without proper authentication. *See id*.

## Sufficiency of Evidence

[33] When reviewing sufficiency of the evidence in support of a conviction, we will consider only probative evidence in the light most favorable to the trial court's

judgment. *Binkley v. State,* 654 N.E.2d 736, 737 (Ind. 1995), *reh'g denied.* The decision comes before us with a presumption of legitimacy, and we will not substitute our judgment for that of the fact-finder. *Id.* We do not assess the credibility of the witnesses or reweigh the evidence in determining whether the evidence is sufficient. *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007). Reversal is appropriate only when no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* Thus, the evidence is not required to overcome every reasonable hypothesis of innocence and is sufficient if an inference reasonably may be drawn from it to support the verdict. *Id.* at 147.

[34] To prove Walters aided, induced or caused armed robbery, the State had to prove Walters "knowingly aid[ed], induce[d], or cause[d] John A. Nocito to commit the offense of Armed Robbery, to-wit: John A. Nocito did knowingly by force, take the property belonging to Morgantown IGA, Morgantown, Indiana, from the presence of Wilma Floyd, while armed with a deadly weapon, to-wit: Handgun." (App. Vol. 2 at 3); *see also* Ind. Code §§ 35-42-5-1 & 35-41-2-4 (elements of robbery and aiding, inducing or causing an offense).

[35] Walters argues the State, without the phone records, did not present sufficient evidence she aided Nocito in committing armed robbery. The State's evidence of conspiracy was based almost solely on the records for 6065 Phone. Evidence independent of the phone records to support the State's theory of conspiracy consisted of: 1) Walters' statements to police were internally inconsistent; 2) Walters' statements conflicted with the evidence shown on the store

surveillance video; 3) Walters complicity in hiding the 6065 Phone from the police; and 4) Walters' assurance that Slaten was not the getaway driver.

[36] None of these discrepancies, however, were what the State relied on to support its argument. The State relied almost solely on the evidence from the unauthenticated phone records to support its theory of a conspiracy between Walters, Slaten, and Nocito. There is not sufficient evidence, independent of the phone records, to support the State's case against Walters. Therefore, we reverse her conviction.

## Double Jeopardy

[37] Here, the admission of the 6065 Phone records was error. *See supra* ¶32. Without the admission of those records, the State did not present sufficient evidence to convince Walters of aiding, inducing, or causing armed robbery. *See supra* ¶36. When a conviction is reversed due to an error in the admission of evidence, double jeopardy concerns usually do not apply. *Thompson v. State*, 690 N.E.2d 224, 237 (Ind. 1997). While "double jeopardy forbids a retrial . . . if the reviewing court concludes that the evidence is legally insufficient to support the conviction[,]" *id.*, if the State were able to authenticate the phone records for 6065 Phone, the jury could have found Walters had conspired with Nocito. Therefore, the Double Jeopardy Clause does not preclude a retrial. *See id*.

## Conclusion

The trial court abused its discretion when it admitted the unauthenticated phone records for 6065 Phone in the form of Exhibit 45 and 62. Without those exhibits, the State did not present sufficient evidence to prove Walters aided, caused, or induced Nocito to rob the grocery store with a gun. Accordingly, we reverse. However, as the jury could have found Walters guilty if those records were properly presented, double jeopardy does not attach and the State is allowed to retry Walters.

Reversed.

Baker, J., and Robb, J., concur.