## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 05 2019, 6:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew R. Falk
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Keith L. Caldwell, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 5, 2019 <br><br> Court of Appeals Case No. 18A-CR-3130 <br><br> Appeal from the Hendricks Circuit Court <br><br> The Honorable Daniel F. Zielinski, Judge <br><br> Trial Court Cause No. 32C01-1705-F5-79 |

**Barteau, Senior Judge.**

# Statement of the Case

[1] Keith L. Caldwell appeals his conviction of burglary, a Level 5 felony,[1] with a criminal organization sentencing enhancement.[2] We affirm.

# Issues

[2] Caldwell raises three issues, which we restate as:

I. Whether the trial court erred in admitting phone and text records into evidence.

II. Whether the trial court erred in denying Caldwell's motion for mistrial after the jury issued its verdict.

III. Whether the evidence is sufficient to sustain Caldwell's burglary conviction.

# Facts and Procedural History

[3] Caldwell owned an auto repair shop, which was located in a leased space on Shadeland Avenue in Indianapolis. He ran the shop, and at the times relevant to this case he had no employees. Ernest Snow was Caldwell's acquaintance and frequently spent time at the shop.

---

[1] Ind. Code § 35-43-2-1 (2014).

[2] Ind. Code § 35-50-2-15 (2016).

[4] On Saturday, May 6, 2017, Robert Fields was at work at Ingram Micro's distribution center in Plainfield, Indiana. Ingram distributes personal electronic devices, including Fitbits. On that day, Fields and his co-workers were tasked with loading pallets of Fitbits into several trailers. Ingram leased the trailers from Venture Logistics, a company with an Indianapolis office. Once the trailers were loaded, semis were supposed to take them to a different Ingram facility.

[5] Fields received a visitor while at work on May 6, a man he later identified as Snow. Fields left the building while on break and got into a truck with Snow. Snow told him that he sold shoes and clothes, and Fields was interested in several pairs of shoes Snow described. They exchanged phone numbers.

[6] As a matter of policy, Ingram preferred not to leave trailers containing product on the lot overnight, but on the evening of May 6, Ingram employees left a trailer containing 51,400 Fitbits on the lot because a semi that was supposed to move the trailer did not return. Under those circumstances, an Ingram employee was supposed to notify Scott Sunderman, Ingram's senior manager of safety and security, so that he could implement additional security measures for the trailer. No one notified Sunderman.

[7] Later that night, Fields and Snow communicated by phone calls and text messages. Snow offered Fields ten pairs of shoes in exchange for information about security at the Ingram distribution center where Fields worked. Fields

agreed, and he described the center's security guards and where they were stationed. Snow also asked Fields for information about the last trailer he and his coworkers had loaded earlier that day. Fields told him they had loaded pallets of Fitbits into a trailer, which had been left parked on the lot.

[8] Meanwhile, Snow was also communicating with others. On May 5, he had a text conversation with an unidentified person, stating "Give me a call this morning when you get a chance I have something that may interest you plenty [sic] of money involved[.]" Tr. Ex. Vol. 5, p. 54.

[9] On May 6, Snow texted the same person to ask, "Can you drive a semi truck?" *Id.* at 56. When the other person responded negatively, Snow indicated "i [sic] need some body [sic] that's GAME and I'm gone [sic] give them 15000 the [sic] drive this truck for me from one side of town to the other." *Id.* A few hours later, Snow texted Caldwell, "Bro we gone do it tomorrow get some rest[.]" *Id.* at 57.

[10] Ingram's distribution center was closed on Sunday, May 7, and no one was present except for security guards. On that same day, Snow again texted the unidentified person, asking "Can we work do [sic] you have an outlet a buyer[?]" *Id.* Snow told the other person that he had "six hundred thousand of them" and offered to sell them for "$20 each," or "$15 apiece [sic]" if bought in bulk. *Id.* at 54-55.

[11] Andrew Nungester was an equipment manager for Black Horse Carriers, a shipping company, and he worked in their Plainfield yard. On Monday, May 8, at 6 a.m., he inspected the yard and discovered that one of their semis was missing. Someone had moved a semi to access the missing semi. A camera inside the semi that had been moved showed a man climbing into the cab and reaching for the camera.

[12] Also, on the morning of May 8, 2018, Sunderman was notified that a trailer was missing from Ingram's lot. He learned at that time that the trailer had been loaded with Fitbits. The entrance to the lot was gated, but someone had cut the chain that secured the gate. Ingram had placed a security camera at the facility's loading bays, where trailers were parked. A recording dated May 8 shows a semi entering the trailer parking area at 1:35 a.m. and backing up to the trailer that contained the Fitbits. A person not shown on camera connected the trailer to the semi and drove away with it.

[13] Finally, on the morning of May 8, Venture Logistics employee Jason Hunt was informed that one of the company's trailers was missing from Ingram's distribution center. The trailer was equipped with a GPS tracker, and Hunt obtained tracking information for the trailer. Venture Logistics notified the police.

[14] Next, Hunt followed the GPS data to a location on Indianapolis' east side, where he located an abandoned semi and trailer. Venture Logistics informed

the police of the discovery. Nungester arrived at the scene and identified the semi as Black Horse's property. He determined the truck's GPS and camera had been disabled. Before it was disabled, the internal camera had recorded an individual entering the cab in the early morning hours of May 8, 2017 and reaching for the camera. Meanwhile, Hunt identified the trailer as the Venture Logistics trailer that had been stolen from Ingram. The trailer was empty.

Sunderman also arrived at the location. Venture Logistics employees had given him the trailer's GPS tracking data, and he drove along the indicated route, looking for places where the trailer could have been unloaded. Sunderman determined that Caldwell's shop on Shadeland Avenue was a possible location. He went to the motel across the street and asked to see their security camera recordings. One of the motel's cameras pointed toward the avenue, and in the early morning hours of May 8 it recorded the semi and trailer pulling into the motel parking lot. Next, the semi backed across the avenue and down a lane that led to Caldwell's shop. Sunderman informed the police.

Later, Sunderman saw officers from the Plainfield Police Department and Indianapolis Metropolitan Police Department arrive at the shop. He approached the officers. The shop was closed, and no one was inside. They looked on the ground outside the shop and found plastic seals similar to the kind that Ingram placed on its trailers after they were loaded and ready for transport.

[17]     The police officers obtained a search warrant for the shop. The officers and Sunderman entered the shop at approximately 1 p.m. on May 9. No one was present. Also, there were no signs of forced entry. They found pallets containing most of Ingram's Fitbits in the bays of the garage. Some of the pallets were still in the manufacturer's wrapping, but other boxes had been removed from pallets and broken open. Some of the Fitbits were missing. Police officers later searched Snow's house and found several of the Fitbits, but others were never recovered.

[18]     Next, officers spoke with the owner of a business located next to Caldwell's shop. The owner replayed his security camera recording for the officers. A recording from the early morning hours of May 8 showed a semi and tractor parked outside Caldwell's business for several hours while several unidentified persons unloaded pallets and boxes.

[19]     Meanwhile, Sunderman organized a team of Ingram employees to go to Caldwell Automotive, load the Fitbits into trailers, and take them to an Ingram facility for processing. Sunderman determined that the stolen shipment had a total retail value of approximately 6.7 million dollars, and the unrecovered Fitbits were worth $124,740.

[20]     On May 25, 2017, the State charged Caldwell with burglary, a Level 5 felony; two counts of theft, one as a Level 5 felony and the other as a Level 6 felony; conspiracy to commit burglary, a Level 5 felony; conversion, a Level 5 felony;

and two counts of auto theft, both Level 6 felonies. The State later added a criminal organization sentencing enhancement. Prior to trial, the State dismissed the charge of conspiracy to commit burglary and one count of auto theft.

[21] The State jointly tried Caldwell and Snow. The trial court presided over a bifurcated trial as to Caldwell. During the first phase, the jury determined Caldwell was guilty of burglary and Level 5 felony theft, but not guilty of criminal conversion and the remaining count of auto theft. The State dismissed the Level 6 felony theft charge. During the second phase, the jury determined Caldwell was subject to the criminal organization sentencing enhancement.

[22] At sentencing, the court vacated the theft conviction on double jeopardy grounds and imposed a sentence for burglary, plus the sentencing enhancement. Next, Caldwell sought and received permission to pursue a belated appeal.

# Discussion and Decision

## I. Admission of Evidence

[23] Caldwell argues the trial court erred in admitting State's Exhibit 46, a record of Snow's telephone calls and text messages that the State obtained from Snow's mobile phone service provider. He claims the State failed to demonstrate that the record, which the State concedes is hearsay, met the requirements for admission.

The trial court has broad discretion in ruling on the admissibility of evidence. *Houston v. State*, 957 N.E.2d 654, 657 (Ind. Ct. App. 2011), *trans. denied*. We review for an abuse of discretion, which occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Rolland v. State*, 851 N.E.2d 1042, 1045 (Ind. Ct. App. 2006).

Hearsay evidence is defined as "a statement that . . . is not made by the declarant while testifying at the trial or hearing . . . and . . . is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). In general, hearsay evidence is "not admissible." Ind. Evidence Rule 802.

Numerous exceptions to the rule against hearsay have developed. "[T]he exceptions to the rule have been generally based upon some combination of the unavailability of the declarant, the reliability of the declaration, or the presumed inefficiency of any possible cross-examination." *In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 641 (Ind. 2004). One of the longstanding exceptions permits the admission of records of "regularly conducted business activity[,] provided that certain requirements are met." *Stahl v. State*, 686 N.E.2d 89, 91 (Ind. 1997). "The reliability of business records stems from the fact that the organization depends on them to operate, from the sense that they are subject to review, audit, or internal checks, from the precision engendered by the repetition, and from the fact that the person furnishing the information has a duty to do it correctly." *Id.* at 92.

[27]    The Indiana Supreme Court has determined by rule that the following types of documents, including business records, are admissible despite being hearsay:

> A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Ind. Evidence Rule 803(6).

[28]    Caldwell challenges the validity of the affidavit certifying the company's mobile phone records, so Indiana Evidence Rule 902(11) is relevant to our discussion. That rule provides, in relevant part, that the following type of document is self-authenticating:

> Unless the source of information or the circumstances of preparation indicate a lack of trustworthiness, the original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or

another qualified person. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record - and must make the record and certification available for inspection - so that the party has a fair opportunity to challenge them.

Ind. Evidence Rule 902(11). Evidence that establishes a reasonable probability that the document is what it is claimed to be constitutes sufficient authentication or identification. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*.

[29]     In Caldwell's case, the State had notified Caldwell prior to trial that it intended to introduce Snow's phone and text records into evidence, accompanied by a certifying affidavit from an employee of Snow's mobile phone service provider. The State disclosed the records and affidavit to Caldwell before trial.

[30]     After the jury was selected and the trial court read preliminary instructions, but before the parties presented opening statements, Caldwell informed the court it intended to object to the records, claiming the affidavit was insufficient. After discussion, the trial court granted the request to exclude the records due to insufficient authentication.

[31]     Later in the trial, the State asked the court to reconsider its ruling excluding the mobile phone records, asserting that it had obtained a new authenticating affidavit. Caldwell objected, stating among other grounds that he could not determine if the records were the same as the records he had received prior to

trial.  The prosecutor affirmed as an officer of the court that the records were identical.  The court determined that it would allow the records into evidence.  The court further stated that the authenticating affidavit would not be presented to the jury.

[32]  The State presented the records as State's Exhibit 46, which consisted of:  (1) a statement that the records were from Ernest Snow's account; (2) an Excel spreadsheet identifying Snow's phone calls; (3) a document explaining the categories in the spreadsheet; and (4) four pages of Snow's texts.  Caldwell objected on grounds of relevancy, but the court overruled the objection.

[33]  The authenticating affidavit provides, in relevant part:

### AUTHENTICATION OF BUSINESS RECORDS

I, Thomas Gaffney, on behalf of Verizon Wireless, being first duly sworn upon my oath, state the following:

1.  I am the custodian of the records attached hereto, which include the arrest records of Ernest Ray Snow Jr.  There is one .zip file attached to this Authentication.

2.  The copies of records for which this certification is made are true reproductions of the original records maintained in our files.

3.  The records were made at or near the time of the occurrence of the matters set forth in the record, by or from information transmitted by a person with knowledge of the occurrence of the matters recorded.

4.  The records are kept in the course of regularly conducted activity.

5. The records were made by the regularly conducted activity as a regular practice.

6. This certification is given by the custodian of the records in lieu of the custodian's personal appearance pursuant to § 803(6), § 901, and § 902 of the Indiana Rules of Evidence.

7. I affirm under the penalties for perjury that the foregoing representations are true.

Tr. Vol. 5, p. 53. Gaffney signed the authentication under penalties of perjury, and his signature was notarized.

[34] Caldwell does not dispute that Gaffney's affidavit met the requirements of subsections (A)-(C) of Evidence Rule 803. He instead claims that the affidavit, which mistakenly described the record as an arrest record, failed to sufficiently describe the mobile phone records, demonstrating a lack of trustworthiness. We disagree. Setting aside the mistaken reference to arrest records, the affidavit clearly identifies the records as belonging to Ernest Ray Snow, Jr., and further states that the records are attached in the form of a .zip file. Further, the records included a statement that they belonged to Snow. The affidavit was thus more than mere boilerplate and sufficiently described the records it authenticated. *See Fry*, 885 N.E.2d at 749 (Ind. Ct. App. 2008) (no error in admission of phone records; affidavit was sufficient to authenticate records); *cf. Speybroeck v. State*, 875 N.E.2d 813, 820 (Ind. Ct. App. 2007) (affidavit insufficient to certify business records; affidavit did not state what records were being authenticated, or to whom the records referred); *cf. also Walters v. State*,

120 N.E.3d 1145, 1155-56 (Ind. Ct. App. 2019) (affidavit insufficient to certify phone records; affidavit did not identify the name of the customer or the telephone number and did not identify the number of pages in the records). Gaffney's affidavit established a reasonable probability that the records were what they claimed to be, and the trial court did not abuse its discretion in admitting the phone and text records into evidence.

## II. Motion for Mistrial

[35] Caldwell argues the trial court erred in denying his motion for mistrial, claiming the jury was exposed to extraneous materials during deliberations for phase one of the trial. In response, the State claims Caldwell waived this claim by failing to timely request a mistrial.

[36] "On appeal, a trial judge's discretion in determining whether to grant a mistrial is afforded great deference, because the trial judge 'is in the best position to gauge the surrounding circumstances of an event and its impact on the jury.'" *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001) (quoting *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989)). A mistrial is an extreme remedy that is justified only when other remedial measures are insufficient to rectify the situation. *Id.* A motion for mistrial must be timely to preserve the issue for appellate review. *See Vacendak v. State*, 431 N.E.2d 100, 107 (Ind. 1982) (motions for mistrial challenging witness's clothes and witness's answers to prosecutor's question deemed untimely, did not preserve those issues for appellate review).

[37]     In Caldwell's case, during deliberations for phase one of the trial, the jury informed the trial court that the video equipment in the jury room was not working. The parties and the court agreed that the bailiff would show them video exhibits on a video player in the courtroom, with no one else present.

[38]     After the bailiff played the exhibits, the jurors asked him to also show them a PowerPoint slide that the State had presented during closing arguments. The slide apparently contained excerpts from Snow's phone records, but it had not been admitted into evidence. The bailiff showed the jurors the slide. He later told one of the parties about displaying the slide to the jurors, and the party requested a hearing with the trial court while the jury deliberated.

[39]     During the hearing, Caldwell asked, "I'm just saying I think it's an issue and how do we deal with it?" Tr. Vol. 3, p. 144. He requested a limiting instruction, but the court denied the request, concluding: (1) there was no prejudicial error; and (2) "if anything [a limiting instruction would] draw more attention to it." *Id.* at 145-46. Caldwell responded, "that's a point that could be made as well." *Id.* at 146.

[40]     After the jury returned its verdict on the charges in phase one, the court sent the jurors back to the jury room to prepare for the second phase of the trial, addressing the criminal organization sentencing enhancement. Outside the presence of the jury, the parties and the court discussed whether Caldwell's bond should be revoked and discussed the preliminary instructions. Next, the

court took a short break, and then the court and the parties resumed their discussion of the jury instructions. They also discussed whether Caldwell's fiancée could testify during the second phase of the trial even though she had sat through the first phase of the trial.

[41] After the discussion ended, the jury reentered the courtroom and the trial court read preliminary instructions to the jury on the criminal organization enhancement. The parties presented opening statements, and Caldwell presented evidence from Caldwell's fiancée. The parties then made closing arguments, and the court read final instructions to the jury. After the jury retired to deliberate on the sentencing enhancement, Caldwell moved for a mistrial, citing the PowerPoint slide that the bailiff showed the jury during their deliberations on phase one of the trial. Over an hour had elapsed since the jury had issued its verdict for phase one of the trial.

[42] We agree with the State that Caldwell's motion for mistrial was untimely and failed to preserve the PowerPoint issue for appellate review. If Caldwell had made the motion before the jury returned its verdict on phase one, then the trial court would have had an opportunity to consider the issue in more depth, including reassessing whether a limiting instruction might be necessary. Caldwell's late motion deprived the court of an opportunity to address the matter without resorting to the extreme remedy of mistrial. *See Crisp v. State*, 394 N.E.2d 115, 120 (Ind. 1979) (describing a motion for mistrial that was presented after the verdict as "filed at the wrong time").

[43] As an alternative ground for relief, Caldwell argues the bailiff's display of the PowerPoint to the jury during deliberations amounted to fundamental error. A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). "The error claimed must either 'make[ ] a fair trial impossible' or constitute 'clearly blatant violations of basic and elementary principles of due process.'" *Id.* (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)).

[44] We cannot address the fundamental error claim because the PowerPoint slide is not included in the record. Caldwell was obligated to include in his Appendix "any other short excerpts from the Record on Appeal, in chronological order, such as pertinent pictures, that are important to a consideration of the issues raised on appeal." Ind. Appellate Rule 50(B)(1)(d). The Record on Appeal includes "all proceedings before the trial court." Ind. Appellate Rule 2(L). Indiana Appellate Rule 49(B) provides, "[a]ny party's failure to include any item in an Appendix shall not waive any issue or argument." Even so, without seeing the slide, we cannot determine whether the bailiff's display of the slide to the jury during deliberations amounted to fundamental error.

## III. Sufficiency of the Evidence

[45] Caldwell challenges the sufficiency of the evidence supporting his burglary conviction. His sufficiency claim is contingent upon this Court determining that the trial court erred in admitting Snow's mobile phone records into

evidence. *See* Appellant's Br. p. 22 ("Because the State's Exhibit 46 should have been excluded, his conviction for this reason should also be reversed."). Having determined that the trial court did not err in admitting Exhibit 46, we need not further address Caldwell's sufficiency claim.

## Conclusion

[46] For the reasons stated above, we affirm the judgment of the trial court.

[47] Affirmed.

Kirsch, J., and Robb, J., concur.